## IN THE UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| PETIMAT DUDURKAEWA, individually, and on behalf of all others similarly situated, | Case No. 23-cv-817-R |
| Plaintiff, | Consolidated with: Case No. 23-cv-954-R and Case No. 23-cv-955-R |
| And | Honorable Judge David L. Russell |
| CHRIS RUBENSTEIN and SHERRY LINMAN, on behalf of herself, her minor child, L.L., and on behalf of all others similarly situated, | |
| Consolidated Plaintiffs, | |
| v. | |
| MIDFIRST BANK and MIDLAND FINANCIAL CO., | |
| Defendants. | |

## <u>CONSOLIDATED CLASS ACTION COMPLAINT</u>

Plaintiffs Petimat Dudurkaewa, Chris Rubenstein, and Sherry Linman, on behalf of herself and her minor child, L.L., (collectively, "Plaintiffs") and on behalf of all others similarly situated (the "Class" or "Class Members"), bring this class action lawsuit against Defendants Midfirst Bank and Midland Financial Co. (collectively, "Midfirst" or "Defendant"). The following allegations are based on Plaintiffs' knowledge, investigations of counsel, facts of public record, and upon information and belief.

## I.     <u>INTRODUCTION</u>

1

1.      Plaintiffs bring this class action lawsuit against Midfirst for their failure to protect and safeguard the highly sensitive Personally Identifiable Information ("PII") of Plaintiffs and the Class.[1]

2.      As a result of Midfirst's failure to implement adequate data security and privacy measures in its use of the MOVEit software, well-known ransomware cybergang, Cl0p ("Clop") easily accessed and ***stole*** the PII of Plaintiffs and the Class in a massive and preventable data breach ("Data Breach" or "Breach"). Though the exact number of Class Members is unknown at this time, the Attorney General of Texas Data Security Breach Reports identified 20,479 Texans alone were affected by the Data Breach. Considering Midfirst is the largest privately owned bank in the United States, the Class likely consists of hundreds of thousands of additional victims across the United States whose PII was compromised in the Data Breach.

3.      Now, Plaintiffs' and the Class's confidential PII is in the hands of cybercriminals who have already begun misusing and leaking stolen data obtained in the Breach on the dark web.

4.      On May 31, 2023, Midfirst learned that the file transfer application it used, and negligently failed to secure, MOVEit, was the subject of a cyberattack.[2]

5.      The type of PII stolen in the Data Breach included at least: names, Social Security numbers, and account numbers, among other information.

---

[1] *See* Exhibits 1-3.
[2] *Id.*

6.      Regrettably, Clop has already exploited the PII stolen in the Data Breach by posting Plaintiffs' and Class Members' PII on the dark web and creating "clearweb" sites to leak the stolen PII.[3]

7.      None of this should have happened because the Data Breach was entirely preventable.

8.      Indeed, MOVEit users, such as Midfirst, are each separately responsible for deciding what kinds of files to transfer using MOVEit, and for configuring the application to operate in a secure manner in their independent environments.

9.      However, Midfirst utterly failed to configure the application to operate in a secure manner in its independent environment.

10.     On or around August 25, 2023, Midfirst began sending breach notice letters ("Notice Letter" or "Notice of Data Breach Letter") to those impacted by the Data Breach, informing them that their PII was accessed and stolen in the Data Breach and was now at risk of misuse.[4]

11.     The PII compromised in the Data Breach included highly sensitive data that represents a gold mine for data thieves. Armed with the PII stolen in the Data Breach, data thieves can commit and have already committed a variety of sordid crimes including, *e.g.*, stealing funds from Class Members' financial accounts, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' names to obtain medical services, using Class Members' information to obtain government

---

[3] https://www.blackfog.com/what-we-know-about-the-moveit-exploit/
[4] *See* Exhibits 1-3.

benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

12.     Plaintiffs and the Class entrusted their PII to Midfirst to receive banking and financial services.

13.     Defendant willingly accepted the responsibility of implementing adequate data security measures in its use of the MOVEit software and failed to ensure that the MOVEit software had security capabilities to protect Plaintiffs' and Class Members' PII.

14.     There has been no assurance offered by Midfirst that Midfirst has adequately enhanced its data security practices within its own environment to avoid a similar data breach in the future.

15.     Similarly, Midfirst has not stated it will terminate its use of the MOVEit software or apply the software patches issued by the MOVEit service provider, Progress Software Corporation ("PSC").

16.     Therefore, Plaintiffs and Class Members have suffered and are at an imminent, immediate, and continuing increased risk of suffering ascertainable losses as a result of the Data Breach. Specifically, Plaintiffs and Class Members have already experienced fraudulent attempts to make unauthorized purchases and obtain loans in their names. Further, since the Data Breach occurred in May of 2023, multiple Plaintiffs and Class Members have received notifications that their PII is now on the dark web.

17.     The improper access and theft of Plaintiffs' and Class Members' PII was a known risk to Defendant.

18.     Specifically, Midfirst knew that if it did not individually implement appropriate security measures with its use of the MOVEit software, that a data breach would occur and Plaintiffs' and the Class's PII would be stolen.

19.     Upon information and belief, Defendant failed to employ adequate, independent security measures in its use of the MOVEit software. Had Defendant properly monitored its use of the MOVEit software, the Data Breach would not have happened.

20.     Plaintiffs' and Class Members' identities are now at risk because of Defendant's negligent conduct as the PII that Defendant collected and maintained is now in the hands of data thieves and other unauthorized third parties.

## II.     PARTIES

21.     Plaintiff **Petimat Dudurkaewa** ("Plaintiff Dudurkaewa") is, and at all times mentioned herein was, a citizen and resident of the State of Arizona. Plaintiff Dudurkaewa received a Notice Letter informing her that her PII was accessed and stolen in the Data Breach.[5]

22.     Plaintiff **Chris Rubenstein** ("Plaintiff Rubenstein") is, and at all times mentioned herein was, a citizen and resident of the State of California. Plaintiff Rubenstein received a Notice of Data Breach Letter informing him that his PII was accessed and stolen in the Data Breach.[6]

23.     Plaintiff **Sherry Linman** ("Plaintiff Linman"), on behalf of herself and her minor child, **L.L.**, is, and at all times mentioned herein was, a citizen and resident of the State

_____

[5] *See* **Exhibit 1**.
[6] *See* **Exhibit 2**.

of Arizona. Plaintiff Linman received a Notice of Data Breach Letter informing her that her PII and the PII of her minor child were accessed and stolen in the Data Breach.[7]

24.    Defendant **Midfirst** is an Oklahoma corporation with its principal place of business at 501 NW Grand Blvd. Oklahoma City, Oklahoma 73118. Midland Financial Co. is the holding corporation for Midfirst headquartered in Oklahoma City and located at 501 NW Grand Boulevard, Oklahoma City, Oklahoma 73118.

### III.    JURISDICTION AND VENUE

25.    Jurisdiction is proper in this Court under 28 U.S.C. § 1332 (diversity jurisdiction). Specifically, this Court has subject matter and diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action where the amount in controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one Class Member is a citizen of a state different from Defendant.

26.    Supplemental jurisdiction to adjudicate issues pertaining to state law is proper in this Court under 28 U.S.C. § 1367.

27.    Defendant is headquartered and/or routinely conducts business in the State where this District is located, has sufficient minimum contacts in this State, has intentionally availed itself of this jurisdiction by marketing and/or selling products and/or services and/or by accepting and processing payments for those products and/or services within this State.

---

[7] *See* **Exhibit 3**.

28.     Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events that gave rise to the Plaintiffs' claims took place within this District and Defendant is headquartered and/or does business in this Judicial District.

## IV.     FACTUAL ALLEGATIONS

**A. *The Collection of Plaintiffs' and Class Members' PII.***

29.     Midfirst is the nation's largest privately owned bank with assets totally $36.6 billion.[8]

30.     "MidFirst Bank serves more than one million accounts for customers nationwide and offers a full range of personal, commercial, trust, private banking and mortgage banking products and services."[9]

31.     Due to the nature of the banking and financial services Midfirst provides, Defendant acquires and electronically stores the PII of Plaintiffs and the Class.

32.     After receipt of Plaintiffs' and Class Members' PII, Midfirst used the MOVEit application to store and/or transfer Plaintiffs' and the Class's PII.

33.     Defendant derived a substantial economic benefit from collecting Plaintiffs' and Class Members' PII. In fact, without the required submission of PII, Defendant could not perform its banking and financial services.

34.     By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiffs' and Class Members' PII to ensure

---

[8] https://www.midfirst.com/about-us (last visited Dec. 26, 2023).
[9] *Id.*

it was not subject to unauthorized disclosure and exfiltration.

35.     Because of the highly sensitive and personal nature of the information Midfirst acquired and stored, Defendant promised to, among other things: keep Plaintiffs' and the Class's PII private; implement adequate data security and oversight measures in its use of the MOVEit software; ensure that the MOVEit software had security measures in place to maintain the confidentiality of Plaintiffs' and Class Members' PII; comply with industry standards related to data security; only use and release highly sensitive information stored for reasons that relate to the services they provide; and provide adequate notice to individuals if their PII was disclosed without authorization.

36.     In fact, according to Midfirst Bank's Privacy Practices, Midfirst promises to "use technical, physical, and administrative security measures designed to comply with applicable law and protect the security of [customers'] personal information...." Midfirst's notice of Privacy Practices further provides that the security measures include, "device safeguards, encryption, and firewalls."[10]

37.     Defendant had obligations under the FTC Act, industry standards, and representations made to Plaintiffs and Class Members, to keep their PII confidential and to protect it from unauthorized access and disclosure.

38.     Plaintiffs and Class Members are current or former customers of Midfirst who provided their PII to Defendant in exchange for banking and financial services.

39.     Plaintiffs and Class Members provided their PII to Defendant with the reasonable expectation and mutual understanding that Defendant would exercise reasonable

_____

[10] https://www.midfirst.com/privacy-and-security-practices/privacy-practices

8

oversight measures to ensure the MOVEit software had security measures in place capable of maintaining the confidentiality of Plaintiffs' and Class Members' PII.

40.     Plaintiffs and Class Members relied on Defendant to securely maintain their PII and to implement adequate privacy measures in its use of the MOVEit software, which Defendant ultimately failed to do.

**B.** *Midfirst's Massive and Preventable Data Breach.*

41.     On or around May 31, 2023, Midfirst learned that that the file transfer application it used, and failed to adequately secure, was infiltrated by cybercriminals in a massive and preventable data breach occurring on May 29, 2023.[11]

42.     As a result of Defendant's failure to configure the MOVEit software to operate in a secure manner within its individual environment, cybercriminals exploited a vulnerability in the software and were able to download files containing Midfirst's customers' information.[12] As such, Plaintiffs' and the Class's PII was stolen and is now in the hands of cybercriminals.

43.     The information stolen during the Data Breach included highly sensitive PII such as: names, Social Security numbers, and account number(s), among other information.[13] Thus, Clop accessed a cache of the highly valuable PII of potentially hundreds of thousands of individuals through the Data Breach.

44.     Despite learning of the Data Breach in May of 2023, Midfirst did not begin notifying Data Breach victims that their PII had been exposed until on or around late August

---

[11] *See* Exhibits 1–3.

[12] *Id.*

[13] *Id.*

of 2023. [14]

45.     As stated above, the Data Breach was perpetrated by notorious ransomware cybergang, Clop.

46.     Clop is a financially motivated "cybercriminal organization that is known for deploying ransomware attacks against various targets worldwide."[15]

47.     Clop is also particularly well-known for its double extortion tactics.[16] Through this technique Clop will encrypt and exfiltrate sensitive information from the systems it infiltrates and demand a ransom payment in exchange for decrypting the files.[17] Clop will then release the sensitive data it obtains on its dark web leak site if payment is not made.[18] This model is used so that Clop has additional leverage to collect a ransom payment.[19]

48.     Clop has already deployed its signature approach here as multiple Plaintiffs have received notifications that their PII is now on the dark web.

49.     Recently, Clop also started leaking data stolen in similar data breaches on the clearweb.[20] "A clearweb website is hosted directly on the Internet rather than on anonymous networks like Tor, which requires special software to access. This new method makes it easier to access the data and will likely cause it to be indexed by search engines, further expanding

---

[14] *Id.*
[15] https://security.packt.com/clop-what-you-have-to-know/; *see also* https://www.hhs.gov/sites/default/files/clop-ransomware-analyst-note-tlpclear.pdf.
[16] https://www.hhs.gov/sites/default/files/clop-ransomware-analyst-note-tlpclear.pdf.
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] https://www.bleepingcomputer.com/news/security/clop-now-leaks-data-stolen-in-moveit-attacks-on-clearweb-sites/.

the spread of the leaked information."[21] Plaintiffs fear the same tactic may be used here.

50.     Regardless, Clop has made it clear that Plaintiffs' and the Class's PII was stolen in the Data Breach and is on the dark web.

51.     Defendant had obligations created by contract, industry standards, common law, and representations made to Plaintiffs and Class Members to keep Plaintiffs' and Class Members' PII confidential and to protect it from unauthorized access and disclosure.

52.     Plaintiffs and Class Members provided their PII to Midfirst with the reasonable expectation and mutual understanding that Midfirst would comply with its obligations to keep such PII confidential and exercise meaningful oversight measures to ensure the MOVEit software was capable of protecting Plaintiffs' and Class Members' PII.

53.     Defendant's data security obligations were particularly important given the substantial increase in cyberattacks in recent years, including recent similar attacks against secure file transfer companies like Accellion and Fortra carried out by the same Russian cybergang, Clop.[22]

54.     Thus, Defendant knew or should have known that their electronic records transferred using MOVEit would be targeted by cybercriminals.

**C. *Midfirst has an Independent Responsibility for the Data Breach and Could Have Prevented the Data Breach.***

55.     Midfirst was independently responsible for securing their installation of the

---

[21] *Id.*

[22] *See* https://www.bleepingcomputer.com/news/security/global-accellion-data-breaches-linked-to-clop-ransomware-gang/#:~:text=After%20stealing%20the%20data%2C%20they,discovered%20almost%20a%20dozen%20victims

MOVEit software and could have prevented the Data Breach if they had taken this responsibility seriously.

56.     Midfirst has network infrastructures specific to their organizations and had the sole responsibility of designing and developing their security networks.

57.     It is up to Midfirst to employ software and practices that control and monitor access to their data and systems.

58.     Midfirst was independently responsible for deciding what kinds of files to transfer using MOVEit and configuring the product to operate in a secure manner in their environments.

59.     In sum, Midfirst had the sole responsibility to determine:

a)  How to protect and configure the environments in which MOVEit was operating;

b)  What kind of data was transferred and stored via MOVEit;

c)  Whether and how to encrypt that data; and

d)  Whether to monitor or respond to early indicators that hackers were taking steps to access and exfiltrate that data.

60.     The creator of MOVEit, PSC, acknowledges this responsibility and publishes detailed recommendations for users, such as Midfirst, regarding the configuration of the MOVEit software:

> Updates, settings, accounts, and policies should be reviewed on a regular cadence to ensure the configuration is meeting current compliance frameworks and to review for unexpected activity or behavior that needs to be addressed. It is recommended that MOVEit administrators perform a regular security audit with their corporate security and compliance teams.  Many teams perform this monthly or quarterly. This document is intended to

provide MOVEit administrators with a starting point to create
their own security checklist that can be used for regular reviews.
The list is not exhaustive and not all recommendations will apply
to all MOVEit installations.[23]

61.     PSC gives a detailed installation and configuration manual so that MOVEit

users are in control of the security features offered in the software. Midfirst disregarded these

directives and failed to employ any security features in the software.

62.     PSC also provides an administrator guide and a security best practices guide to

aid in configuring and securing the MOVEit Transfer application. However, Midfirst

disregarded these directives and did not implement any of them.

63.     Additionally, other software and hardware solutions are involved such as

routers, firewalls, and mail servers which provided access to the MOVEit server to those who

should not have it, like Clop. Those other software solutions and systems are not produced or

maintained by PSC and are not the responsibility of PSC to secure. It is the responsibility of

Midfirst.

64.     The data is hosted, maintained, and secured by Midfirst, not PSC.

65.     As such, Midfirst was responsible for securing its installation of the MOVEit

software and designing and securing their network infrastructures. However, Midfirst utterly

failed to do so.

66.     This is evidenced by the fact that not all MOVEit users were impacted.

67.     Indeed, some MOVEit users had appropriate monitoring and other security

measures in place and, as a result, were able to detect and thwart efforts to exploit the MOVEit

---

[23] https://community.progress.com/s/article/MOVEit-Security-Best-Practices-Guide.

vulnerability on their systems.

68.    For instance, on May 27, 2023, Akamai, a managed detection and response service that corporations can hire to monitor their data systems, detected the attack and prevented it. "Akamai researchers detected exploitation attempts against one of Akamai's financial customers — an attack that was blocked by the Akamai Adaptive Security Engine."[24]

69.    Midfirst could have mitigated this particular vulnerability and prevented the theft of Plaintiffs' and Class Members' PII by ensuring the MOVEit software was secure and contained reasonable data security safeguards.

70.    Clop used the ATT&CK Techniques for Enterprise.

71.    Clop simply exploited a weakness in MOVEit to write a file to the web server which was a Remote Access Tool.

72.    Security measures to prevent unauthenticated users from Russian IP addresses accessing the server would have stopped the Breach in its tracks. However, Midfirst did not have these security measures in place.

73.    A deny all default approach to security would have prevented the Breach. However, Midfirst did not have this in place.

74.    Any one of the following security measures, if employed by Midfirst, could have prevented the Data Breach from occurring:

a) **Denying write access to all but local accounts used for writing to the web directory.** There is no reason to grant unauthenticated user access and all user access to a file or directory that does not

---

[24]   *See*   https://www.akamai.com/blog/security-research/moveit-sqli-zero-day-exploit-clop-ransomware.

need write access. Additionally, there are solutions with MOVEit and third-party solutions to provide an email or SMS notification in the event files are accessed, created, or modified.

b) **A firewall dropping all packets originating from IP addresses outside of the organization.** By dropping all packets from foreign IP addresses, this would have prevented Clop the ability to connect to perform the SQL injection.

c) **Placing the server in a DMZ.** This would have prevented Clop from delivering the TrueBot malware, thus stopping the Data Breach. Publicly facing web servers can provide an attacker access inside the organization where they can traverse systems on the inside of any perimeter firewalls. A DMZ would help mitigate that vulnerability.

75.     Unfortunately for Plaintiffs and the Class, Midfirst failed to implement any of the above measures prior to the Data Breach.

**D.  *Midfirst Failed to Comply with FTC Guidelines***

76.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

77.     In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored

on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

78.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers, have implemented reasonable security measures.

79.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

80.     As evidenced by the Data Breach, Midfirst failed to properly implement basic data security practices. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs' and Class Members' PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

81.     Defendant was at all times fully aware of its obligations to protect the PII of Plaintiffs and Class Members yet failed to comply with such obligations. Defendant was also

aware of its responsibilities to configure the MOVEit software to operate in a secure manner in their environments.

82.    Some industry best practices that should be implemented by businesses like Defendant include but are not limited to configuring software to operate in a secure manner in its environment; educating all employees; strong passwords; multilayer security including firewalls, anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data; and limiting which employees can access sensitive data. As evidenced by the Data Breach, Midfirst failed to follow some or all these industry best practices.

83.    Other best cybersecurity practices that are standard in the industry include: installing appropriate malware detection software; monitoring software containing highly sensitive PII; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff and customers regarding these points. As evidenced by the Data Breach, Midfirst failed to follow these cybersecurity best practices.

84.    Midfirst failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

85.    Midfirst failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

**E.** *Midfirst Breached its Duties to Safeguard Plaintiffs' and Class Members' PII.*

86.     In addition to their obligations under federal and state laws, Midfirst owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, transferring, storing, retaining, securing, safeguarding, deleting, and protecting the PII in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

87.     Midfirst owed a duty to Plaintiffs and Class Members to provide reasonable data security, including deciding what kinds of files to transfer using the MOVEit software and ensuring the software was configured to operate in a secure manner to protect Plaintiffs' and Class Members' PII.

88.     Defendant breached its duties and obligations owed to Plaintiffs and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard Plaintiffs' and the Class's PII. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

    a.  failing to maintain adequate data security and privacy measures in its use of the MOVEit software;

    b.  failing to adequately protect customers' PII;

    c.  failing to properly oversee and monitor the MOVEit software;

    d.  failing to ensure that the MOVEit software had security measures in place to safeguard Plaintiffs' and Class Members' PII;

    e.  failing to sufficiently train its employees regarding the proper handling of its customers' files containing the PII;

    f.  failing to fully comply with FTC guidelines for cybersecurity in violation of

18

the FTCA;

g.   failing to adhere to industry standards for cybersecurity as discussed above; and

h.   otherwise breaching duties and obligations to protect Plaintiffs' and Class Members' PII.

89.     Due to its failure to deploy the MOVEit software in a secure manner, Midfirst negligently and unlawfully exposed Plaintiffs' and Class Members' PII, thereby allowing Clop to easily steal Plaintiffs' and Class Members' PII.

90.     Had Midfirst remedied the deficiencies in its information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, it could have prevented intrusion into its information storage and security systems through the MOVEit software, and ultimately, the theft of Plaintiffs' and Class Members' confidential PII.

91.     Accordingly, Plaintiffs' and Class Members' lives were severely disrupted. What's more, they have been harmed as a result of the Data Breach and have suffered multiple instances of actual misuse of their PII and are at an imminent threat of additional instances of identity theft and fraud. Plaintiffs and Class Members also lost the benefit of the bargain they made with Defendant.

**F.  *Midfirst Should Have Known that Cybercriminals Target PII to Carry Out Fraud and Identity Theft***

92.     The FTC hosted a workshop to discuss "informational injuries," which are injuries that consumers like Plaintiffs and Class Members suffer from privacy and security

incidents such as data breaches or unauthorized disclosure of data.[25]

93.     Exposure of highly sensitive personal information that a consumer wishes to keep private may cause harm to the consumer, such as the ability to obtain or keep employment.

94.     Any victim of a data breach is exposed to serious ramifications regardless of the nature of the data that was breached. Indeed, the reason why criminals steal information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims or to take over victims' identities in order to engage in illegal financial transactions under the victims' names.

95.     Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity or to otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

---

[25] *FTC Information Injury Workshop, BE and BCP Staff Perspective,* Federal Trade Commission, (October 2018), *available at* https://www.ftc.gov/system/files/documents/reports/ftc-informational-injury-workshop-be-bcp-staff-perspective/informational_injury_workshop_staff_report_-_oct_2018_0.pdf

96.     In fact, as technology advances, computer programs may scan the Internet with a wider scope to create a mosaic of information that may be used to link compromised information to an individual in ways that were not previously possible. This is known as the "mosaic effect." Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts.

97.     Thus, even if certain information was not purportedly involved in the Data Breach, the unauthorized parties could use Plaintiffs' and Class Members' PII to access accounts, including, but not limited to, email accounts and financial accounts, to engage in a wide variety of fraudulent activity against Plaintiffs and Class Members.

98.     For these reasons, the FTC recommends that identity theft victims take several time-consuming steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert on their account (and an extended fraud alert that lasts for 7 years if someone steals the victim's identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a freeze on their credit, and correcting their credit reports.[26] However, these steps do not guarantee protection from identity theft but can only mitigate identity theft's long-lasting negative impacts.

99.     Identity thieves can also use stolen personal information such as Social

---

[26] *See IdentityTheft.gov,* Federal Trade Commission, *available at* https://www.identitytheft.gov/Steps.

Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, bank fraud, to obtain a driver's license or official identification card in the victim's name but with the thief's picture, to obtain government benefits, or to file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house in the victim's name, receive medical services in the victim's name, and even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

100.   PII can be used to detect a specific individual. PII is a valuable property right. Its value is axiomatic, considering the value of big data in corporate America and the consequences of cyber thefts (which include heavy prison sentences). Even this obvious risk-to-reward analysis illustrates beyond a doubt that PII has considerable market value.

101.   The U.S. Attorney General stated in 2020 that consumers' sensitive personal information commonly stolen in data breaches "has economic value."[27] The increase in cyberattacks, and attendant risk of future attacks, was widely known and completely foreseeable to the public and to anyone in Defendant's industry, including Defendant.

102.   The PII of consumers remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, PII can be sold at a price ranging from $40 to $200, and

---

[27] *See Attorney General William P. Barr Announces Indictment of Four Members of China's Military for Hacking into Equifax*, U.S. Dep't of Justice, Feb. 10, 2020, available at https://www.justice.gov/opa/speech/attorney-general-william-p-barr-announces-indictment-fourmembers-china-s-military.

bank details have a price range of $50 to $200.[28] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web and that the "*fullz*" (a term criminals who steal credit card information use to refer to a complete set of information on a fraud victim) sold for $30 in 2017.[29]

103.    Furthermore, even information such as names, email addresses and phone numbers, can have value to a hacker.  Beyond things like spamming customers, or launching phishing attacks using their names and emails, hackers, *inter alia*, can combine this information with other hacked data to build a more complete picture of an individual.  It is often this type of piecing together of a puzzle that allows hackers to successfully carry out phishing attacks or social engineering attacks. This is reflected in recent reports, which warn that "[e]mail addresses are extremely valuable to threat actors who use them as part of their threat campaigns to compromise accounts and send phishing emails."[30]

104.    Likewise, the value of PII is increasingly evident in our digital economy. Many companies collect PII for purposes of data analytics and marketing. These companies, collect it to better target customers, and share it with third parties for similar purposes.[31]

105.    One author has noted: "Due, in part, to the use of PII in marketing decisions, commentators are conceptualizing PII as a commodity. Individual data points have concrete

---

[28] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.
[29] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.
[30] *See* https://www.magicspam.com/blog/dark-web-price-index-the-cost-of-email-data/.
[31] *See* https://robinhood.com/us/en/support/articles/privacy-policy/.

value, which can be traded on what is becoming a burgeoning market for PII."[32]

106.    Consumers also recognize the value of their personal information and offer it in exchange for goods and services. The value of PII can be derived not only by a price at which consumers or hackers actually seek to sell it, but rather by the economic benefit consumers derive from being able to use it and control the use of it.

107.    A consumer's ability to use their PII is encumbered when their identity or credit profile is infected by misuse or fraud. For example, a consumer with false or conflicting information on their credit report may be denied credit. Also, a consumer may be unable to open an electronic account where their email address is already associated with another user. In this sense, among others, the theft of PII in the Data Breach led to a diminution in value of the PII.

108.    Data breaches, like that at issue here, damage consumers by interfering with their fiscal autonomy. Any past and potential future misuse of Plaintiffs' PII impairs their ability to participate in the economic marketplace.

109.    A study by the Identity Theft Resource Center[33] shows the multitude of harms caused by fraudulent use of PII:

[IMAGE ON NEXT PAGE]

_____

[32] *See* John T. Soma, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ('PII') Equals the "Value" of Financial Assets,* 15 Rich. J. L. & Tech. 11, 14 (2009).
[33] Steele, Jason, *Credit Card and ID Theft Statistics*, CreditCards.com (October 23, 2017), https://www.creditcards.com/statistics/credit-card-security-id-theft-fraud-statistics-1276/

24



110.    It must also be noted that there ***may*** be a substantial time lag between when harm occurs and when it is discovered, and also between when PII and/or personal financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:[34]

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

111.    PII is such a valuable commodity to identity thieves that once the information

---

[34] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO (June 2007), *available at* https://www.gao.gov/assets/270/262904.html.

has been compromised, criminals often trade the information on the "cyber black market" for years.

112.    As a result, Clop has already disseminated the PII of Plaintiffs and Class Members to the dark web for unauthorized private sales, and Plaintiffs and Class Members have already experienced multiple instances of actual misuse of their PII as a result of the Data Breach. Thus, Plaintiffs and Class Members have no choice but to vigilantly monitor their accounts for many years to come.

**G. *Plaintiffs' Individual Experiences***

**<u>Plaintiff Petimat Dudurkaewa</u>**

113.    Plaintiff Petimat Dudurkaewa provided her PII to Midfirst in order to receive banking and financial services from Defendant.

114.    In or around August 25, 2023, Plaintiff Dudurkaewa received a Notice Letter from Midfirst notifying her that her name, Social Security number, and account number(s), among other information was accessed and downloaded in the Data Breach.[35]

115.    Following the Data Breach, Plaintiff Dudurkaewa experienced, and continues to experience, actual misuse of her PII in the form of identity theft. Specifically, beginning in or around September of 2023, unauthorized third parties have continuously tried to take out loans in Plaintiff Dudurkaewa's name. On October 12, 2023, Plaintiff Dudurkaewa received a notification that a hard inquiry was made on one of her personal accounts, indicating someone was trying to take out a loan in her name. On the same day, she also received a notification that her credit score had decreased since September 14, 2023. Upon

---

[35] *See* **Exhibit 1**.

investigation, Plaintiff Dudurkaewa confirmed that another hard inquiry had also been made on the aforementioned personal account on August 14, 2023.

116.    As a result of the multiple hard inquiries and loans attempted to be acquired in her name, Plaintiff Dudurkaewa's credit score has plummeted. In the month of October alone, Plaintiff Dudurkaewa's credit score dropped almost 100 points (or 14%) between October 6, 2023, and October 21, 2023. As such, Plaintiff Dudurkaewa has suffered, and is currently suffering, actual, concrete damages.

117.    Further, on September 28, 2023, Plaintiff Dudurkaewa was alerted by OnAlert (the Dark Web monitoring service that was provided by Defendant to impacted parties related to the Data Breach) that her phone number was found on the dark web.

118.    As a direct and traceable result of the Data Breach, Plaintiff Dudurkaewa has spent countless *hours* researching the Data Breach, disputing the hard inquiries made into her credit, reviewing and monitoring her accounts for fraudulent activity, reviewing credit reports for fraudulent activity, and monitoring her bills to make sure they are correct. However, this is not the end. Plaintiffs and the Class will now be forced to expend additional time to review their credit reports and monitor their accounts for the rest of their lives. This is time spent at Defendant's direction, which has been lost forever and cannot be recaptured.

119.    Plaintiff Dudurkaewa places significant value in the security of her PII and does not readily disclose it. Plaintiff Dudurkaewa entrusted her PII to Defendant with the understanding that Defendant would keep her information secure, and that Defendant would employ reasonable and adequate security measures to ensure that her PII would not be compromised.

120.   As a direct and traceable result of the Data Breach, Plaintiff Dudurkaewa suffered actual damages such as: (i) theft of her PII; (ii) actual misuse of her PII by an unauthorized third party attempting to obtain multiple loans in her name; (iii) a diminished credit score; (iv) lost time related to disputing the hard inquiries made into her credit, and monitoring her accounts for fraudulent activity; (v) loss of privacy due to her PII being exfiltrated by cybercriminals and published on the dark web; (vi) loss of the benefit of the bargain because Defendant did not adequately protect her PII; (vii) severe emotional distress because identity thieves now possess her PII, and her PII has been found on the dark web; (viii) exposure to an increased and imminent risk of fraud and identity theft now that her PII has been stolen; (ix) loss in value of her PII due to her PII being in the hands of cybercriminals who can use it at their leisure; and (x) other economic and non-economic harm.

121.   As a direct and traceable result of the Data Breach, Plaintiff Dudurkaewa has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for *years* to come. Considering unauthorized actors are actively attempting to obtain loans in Plaintiff Dudurkaewa's name, resulting in her diminished credit score, and the fact that her PII is currently on the dark web, the risk that Plaintiff Dudurkaewa will experience future identity theft and fraud is certainly real and impending.

122.   Midfirst acknowledged the increased risk of future harm Plaintiffs and the Class now face by offering complimentary credit monitoring services to Plaintiffs and the Class. Such an offer is woefully inadequate as it will not prevent identity theft and fraud but will only alert Plaintiff Dudurkaewa once fraud has already occurred. Midfirst's measly offering completely ignores the fact that Plaintiff Dudurkaewa will be at a significant and

imminent risk of future harm for the rest of her life.

123.   Knowing that thieves intentionally targeted, stole, and misused her PII, and knowing that her PII has already been released to the dark web, has caused Plaintiff Dudurkaewa great anxiety beyond mere worry. Specifically, Plaintiff Dudurkaewa has lost hours of sleep, is in a constant state of stress, is very frustrated, and has faced issues in her attempt to move apartments because of her diminished credit score. Plaintiff fears for her personal financial security. These allegations go far beyond mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

124.   Plaintiff Dudurkaewa has a continuing interest in ensuring that her PII, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches.

**Plaintiff Chris Rubenstein**

125.    Plaintiff Chris Rubenstein provided his PII to Midfirst in exchange for online banking services from Midfirst's online banking division, Vio Bank. Plaintiff Rubenstein has been utilizing Midfirst's Vio Bank online banking services for approximately four (4) years.

126.   In or around August 30, 2023, Plaintiff Chris Rubenstein received a Notice Letter from Midfirst notifying him that his PII, including name, Social Security number, account number, and other information, was stolen in the Data Breach.[36]

127.   As a direct and traceable result of the Data Breach, Plaintiff Rubenstein has spent countless hours researching the Data Breach, verifying the legitimacy of the Notice of

---

[36] *See* **Exhibit 2**.

Data Breach, responding to and dealing with the significant increase in phishing emails, self-monitoring his accounts for fraudulent activity, reviewing credit reports for fraudulent activity, and monitoring his bills to make sure they are correct. However, this is not the end. Plaintiff Rubenstein will now be forced to expend additional time to review his credit reports and monitor his accounts for the rest of his life.

128.    Further, on or around October 3, 2023, Plaintiff Rubenstein was alerted by OnAlert (the Dark Web monitoring service that was provided by Defendant to impacted parties related to the Data Breach at issue in this complaint) that his telephone number was found on the Dark Web. Upon notification, and in response, Plaintiff Rubenstein spent additional time and effort adding his bank and/or financial institution account numbers and related information to the OnAlert site to prevent future data breaches and/or identity theft. Since October 3, 2023, Plaintiff has been alerted through OnAlert of numerous instances of his telephone number being found on the Dark Web.

129.    Plaintiff Chris Rubenstein places significant value in the security of his PII and is very careful. Plaintiff Rubenstein entrusted his PII to Midfirst with the understanding that Defendant would keep his PII secure, and that Defendant would employ reasonable and adequate security measures to ensure that his PII would not be compromised.

130.    As a direct and traceable result of the Data Breach, Plaintiff Chris Rubenstein suffered actual damages such as: (i) theft of his PII; (ii) having his PII posted on the dark web; (iii) significant increase in phishing emails; (iv) lost time related to monitoring his accounts for fraudulent activity and adding his bank and financial information to dark web monitoring services; (v) loss of privacy due to his PII being downloaded by cybercriminals

and published on the dark web; (vi) loss of the benefit of the bargain because Defendant did not adequately protect his PII; (vii) severe emotional distress because identity thieves now possess his PII; (viii) exposure to an increased and imminent risk of fraud and identity theft now that his PII has been stolen and is on the dark web; (ix) loss in value of his PII due to his PII being in the hands of cybercriminals who can use it at their leisure; and (x) other economic and non-economic harm.

131.    As a direct and traceable result of the Data Breach, Plaintiff Rubenstein has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for *years* to come. Such a risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the PII compromised by the Data Breach and the fact that his PII has already been found on the dark web.

132.    Knowing that thieves intentionally targeted and stole his PII and have posted it to the dark web has caused Plaintiff Rubenstein great anxiety beyond mere worry. Specifically, Plaintiff Rubenstein has lost hours of sleep, is in a constant state of stress, is very frustrated, and is in a state of persistent worry now that his PII has been stolen. Plaintiff fears for his personal financial security and has uncertainty over what other confidential information may have been stolen in the Data Breach and falls under "among other information". These allegations go far beyond mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

133.    Plaintiff Rubenstein has a continuing interest in ensuring that his PII which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches.

**Plaintiff Sherry Linman on Behalf of Herself and Her Minor Child, L.L.**

134.    Plaintiff Sherry Linman provided her PII and her minor son's PII to Midfirst in receipt of banking and financial services.

135.    In or around August 25, 2023, Plaintiff Linman received a Notice Letter from Midfirst notifying her that her and her son's PII, including their names, Social Security numbers, and account numbers, among other information had been stolen in the Data Breach.[37]

136.    Plaintiff Linman has suffered actual, concrete damages as a result of the Data Breach. Specifically, an unauthorized actor gained access to her debit card account and attempted to use her debit card to complete a $400 charge. On or about November 1, 2023, Plaintiff Linman was contacted by her Credit Union and informed that a $400 charge was fraudulently made to her debit card. She informed Credit Union that the charge was fraudulent, and Credit Union subsequently resolved the charge. The fraudulent activity to Plaintiff Linman's debit card is directly traceable to the Data Breach because it occurred after the Data Breach, and the PII stolen in the Data Breach is precisely the type of PII that is used to commit debit card fraud.

137.    As a direct and traceable result of the Data Breach, Plaintiff Linman has spent hours researching the Data Breach, reviewing and monitoring her accounts for fraudulent activity, reviewing credit reports for fraudulent activity, and monitoring her bills to make sure they are correct. However, this is not the end. Plaintiff Linman and her minor child, L.L., will now be forced to expend additional time reviewing credit reports and accounts for the rest of

---

[37] *See* **Exhibit 3**.

their lives.

138.   Plaintiff Linman places significant value in the security of her and her minor child's PII and does not readily disclose it. Plaintiff Linman entrusted her and her minor child's PII to Midfirst with the understanding that Midfirst would keep their information secure and employ reasonable and adequate security measures to ensure that their PII would not be compromised.

139.   As a direct and traceable result of the Data Breach, Plaintiff Linman and her minor child, L.L., have suffered actual damages such as: (i) theft of their PII; (ii) fraudulent charges to Plaintiff Linman's debit card; (iii) lost time related to monitoring their accounts for additional fraudulent activity; (iv) loss of privacy due to their PII being stolen by cybercriminals; (v) loss of the benefit of the bargain because Defendant did not adequately protect their PII; (vi) severe emotional distress because identity thieves now possess their PII; (vii) exposure to an increased and imminent risk of fraud and identity theft now that their PII has been stolen and Plaintiff Linman's PII has been used to commit fraud; (viii) loss in value of their PII due to their PII being in the hands of cybercriminals who can use it at their leisure; and (ix) other economic and non-economic harm.

140.   As a direct and traceable result of the Data Breach, Plaintiff Linman and her minor child, L.L., have been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for *years* to come. Such a risk is certainly real and impending, and is not speculative, considering the PII stolen in the Data Breach is highly sensitive and Plaintiff Linman has already experienced instances of debit card fraud.

141.   Midfirst acknowledged the increased risk of future harm Plaintiff Linman and

her minor child, L.L., now face by offering complimentary credit monitoring services. Such an offer is woefully inadequate as it will not prevent identity theft and fraud but will only alert Plaintiffs once fraud has already occurred. Midfirst's measly offering completely ignores the fact that Plaintiffs and the Class will be at a significant and imminent risk of future harm for the rest of their lives.

142.    Knowing that thieves intentionally targeted and stole her and her child's PII and knowing that she has already experienced debit card fraud, Plaintiff Linman has suffered great anxiety beyond mere worry. Specifically, Plaintiff Linman has lost hours of sleep, is in a constant state of stress, is very frustrated, and is in a state of persistent worry now that her and her child's PII has been stolen and is currently being used to commit fraud. Plaintiff fears for her and her minor child's personal financial security. These allegations go far beyond mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

143.    Plaintiff Linman and her minor child, L.L., have a continuing interest in ensuring that their PII which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches.

**H. *Plaintiffs' and Class Members' Damages***

144.    Plaintiffs would not have provided their PII to Midfirst had Midfirst disclosed it lacked adequate data security and privacy measures in its use of the MOVEit software.

145.    Additionally, Plaintiffs would not have permitted their PII to be transmitted and/or stored via the MOVEit software had Midfirst disclosed it took no measures to secure it.

146.    Plaintiffs have suffered actual injury in the form of theft of their PII, identity theft, financial fraud, having their PII posted to the dark web, time spent dealing with the Data Breach, and the certainly imminent risk of future fraud and identity theft resulting from the Data Breach.

147.    Plaintiffs suffered actual injury in the form of damages to and diminution in the value of their PII – a form of intangible property that Plaintiffs entrusted to Midfirst.

148.    Plaintiffs suffered imminent and impending injury arising from the substantially increased risk of future fraud, additional fraud, identity theft, and misuse posed by their PII being placed in the hands of criminals.

149.    Plaintiffs and the Class have a continuing interest in ensuring that their PII, which remains in Defendant's possession and stored within MOVEit, is protected, and safeguarded from future breaches.

150.    As a result of the Data Breach, Plaintiffs anticipate spending considerable time and money on an ongoing basis to try to mitigate and address the many harms caused by the Data Breach.

151.    In sum, Plaintiffs and Class Members have been damaged by the theft of their PII in the Data Breach.

152.    Plaintiffs' PII was compromised as a direct and proximate result of the Data Breach, which resulted from Midfirst's failure to ensure it employed adequate data security with the use of the MOVEit software.

153.    As a direct and proximate result of Defendant's actions and omissions, Plaintiffs and Class Members have been harmed and are at an imminent, immediate, and

continuing increased risk of harm, including but not limited to, having loans opened in their names, fraudulent charges made to their accounts, tax returns filed in their names, utility bills opened in their names, credit card accounts opened in their names, and other forms of fraud and identity theft.

154.    Plaintiffs and Class Members also face a substantial risk of being targeted in future phishing, data intrusion, and other illegal schemes through the misuse of their PII, especially since fraudsters have already used Plaintiffs' PII to commit identity theft and fraud.

155.    The PII maintained by and stolen from Defendant, combined with publicly available information, allows nefarious actors to assemble a detailed mosaic of Plaintiffs and Class Members, which can also be used to carry out targeted fraudulent schemes against Plaintiffs and Class Members.

156.    Additionally, as a direct and proximate result of Midfirst's conduct, Plaintiffs and Class Members have also been forced to take the time and effort to mitigate the actual and potential impact of the Data Breach on their everyday lives, including placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and/or closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

157.    Plaintiffs and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

158.    Plaintiffs and Class Members also suffered a loss of value of their PII when it was accessed, viewed, and acquired by Clop in the Data Breach. Numerous courts have

recognized the propriety of loss of value damages in related cases. An active and robust legitimate marketplace for Private Information exists.[38] In 2019, the data brokering industry was worth roughly $200 billion. In fact, the data marketplace is so sophisticated that consumers can sell their non-public information directly to a data broker who in turn aggregates the information and provides it to other companies.[39] Consumers who agree to provide their web browsing history to the Nielsen Corporation can in turn receive up to $50 a year.[40]

159.    As a result of the Data Breach, Plaintiffs' and Class Members' PII, which has an inherent market value in both legitimate and illegal markets, has been harmed and diminished due to its acquisition by cybercriminals. This transfer of valuable information happened with no consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the PII is apparently readily available to others, and the rarity of the PII has been destroyed because it is no longer only held by Plaintiffs and the Class Members. Thus, because such data no longer correlates only with activities undertaken by Plaintiffs and the Class Members, it is diminished in value.

160.    Finally, Plaintiffs and Class Members have suffered or will suffer actual injury as a direct and proximate result of the Data Breach in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

---

[38] *See* Data Coup, https://datacoup.com/.
[39] *What is digi.me?, DIGI.ME,* https://digi.me/what-is-digime/.
[40] *Frequently Asked Questions,* Nielsen Computer & Mobile Panel, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html.

These losses include, but are not limited to, the following:

    a.  Remedying decreased credit scores;

    b.  Monitoring for, discovering, and resolving fraudulent charges;

    c.  Canceling and reissuing credit and debit cards;

    d.  Addressing their inability to withdraw funds linked to compromised accounts;

    e.  Taking trips to banks and waiting in line to obtain funds held in limited accounts;

    f.  Spending time on the phone with or at a financial institution to dispute fraudulent charges;

    g.  Contacting financial institutions and closing or modifying financial accounts;

    h.  Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

    i.  Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled; and

    j.  Closely reviewing and monitoring bank accounts and credit reports for additional unauthorized activity for years to come.

161.     Moreover, Plaintiffs and Class Members have a continuing interest in ensuring that their PII, which is believed to still be in the possession of Defendant, is protected from future additional breaches by the implementation of more adequate data security measures

and safeguards, including but not limited to, ensuring that future third party products housing customers' PII are adequately secure to maintain the confidentiality of such PII.

162.    As a direct and proximate result of Defendant's actions and inactions, Plaintiffs and Class Members have suffered a loss of privacy and have suffered cognizable harm, including identity theft, actual instances of fraud, and the imminent and substantial future risk of additional harm.

## V.    CLASS ACTION ALLEGATIONS

163.    Plaintiffs bring this action individually and on behalf of all other persons similarly situated, pursuant to Federal Rule of Civil Procedure 23.

164.    Specifically, Plaintiffs propose the following Nationwide Class (referred to herein as the "Nationwide Class" or "Class"), subject to amendment as appropriate:

### *Nationwide Class*

All individuals who reside in the United States who received a Notice Letter informing them that they were a victim of the Data Breach.

165.    In addition, Plaintiffs propose the following California Subclass (referred to herein as the "California Subclass" or "California Class"), subject to amendment as appropriate:

### *California Subclass*

All individuals residing in the State of California who received a Notice Letter informing them that they were a victim of the Data Breach.

166.    Excluded from the Class and California Subclass is Midfirst and its parents or subsidiaries, any entities in which they have a controlling interest, as well as their officers,

directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned as well as their judicial staff and immediate family members.

167.    Plaintiffs reserve the right to modify or amend the definitions of the proposed Class and California Subclass, as well as add subclasses, before the Court determines whether certification is appropriate.

168.    The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(1), (b)(2), (b)(3), and (c)(4).

169.    <u>Numerosity</u>. The Class Members are so numerous that joinder of all members is impracticable. Though the exact number and identities of Class Members are unknown at this time, the Attorney General of Texas Data Security Breach Reports identified 20,479 Texans alone were affected by the Data Breach. Based on information and belief, the Class likely consists of thousands of other victims across the United States whose data was compromised in the Data Breach. The identities of Class Members are ascertainable through Defendants' records.

170.    <u>Commonality</u>. There are questions of law and fact common to the Class and Subclasses which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

        a.  Whether Midfirst engaged in the conduct alleged herein;

        b.  When Midfirst learned of the Data Breach;

        c.  Whether Midfirst's response to the Data Breach was adequate;

        d.  Whether Midfirst unlawfully lost or disclosed Plaintiffs' and Class

Members' PII;

e. Whether Midfirst failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the PII compromised in the Data Breach;

f. Whether Midfirst failed to employ appropriate data security measures within MOVEit;

g. Whether Midfirst failed to oversee and monitor the MOVEit software;

h. Whether Midfirst's data security practices related to MOVEit prior to and during the Data Breach complied with applicable data security laws and regulations;

i. Whether Midfirst owed a duty to Class Members to safeguard their PII;

j. Whether Midfirst breached its duties to Class Members to safeguard their PII;

k. Whether Defendant had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiffs and the Class Members;

l. Whether Defendant breached its duty to provide timely and accurate notice of the Data Breach to Plaintiffs and Class Members;

m. Whether Midfirst knew or should have known that their data security systems and monitoring processes as it relates to MOVEit were deficient;

n. What damages Plaintiffs and Class Members suffered as a result of

Defendant's misconduct;

o.  Whether Defendant's conduct was negligent;

p.  Whether Defendant's conduct was *per se* negligent;

q.  Whether Defendant breached implied contracts with Plaintiffs and the Class;

r.  Whether Defendant was unjustly enriched;

s.  Whether Plaintiffs and Class Members are entitled to actual and/or statutory damages;

t.  Whether Plaintiffs and Class Members are entitled to credit or identity monitoring and monetary relief; and

u.  Whether Plaintiffs and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

171.  <u>Typicality</u>. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' PII, like that of every other Class Member, was compromised in the Data Breach.

172.  <u>Adequacy of Representation</u>. Plaintiffs will fairly and adequately represent and protect the interests of Class Members. Plaintiffs' counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

173.  <u>Predominance</u>. Midfirst has engaged in a common course of conduct toward Plaintiffs and Class Members in that all of Plaintiffs' and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The

42

common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

174.    <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for PSC. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

175.    Class certification is also appropriate. Defendant has acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

176.    Finally, all members of the proposed Class are readily ascertainable. Defendant has access to the names, addresses, and/or email addresses of Class Members affected by the Data Breach.

## VI.    <u>CLAIMS FOR RELIEF</u>

### <u>COUNT I</u>

**NEGLIGENCE**
**(On behalf of Plaintiffs and the Nationwide Class)**

177.    Plaintiffs restate and reallege the allegations stated above as if fully set forth herein.

178.    Midfirst knowingly collected, acquired, and stored Plaintiffs' and Class Members' PII, and had a duty to exercise reasonable care in safeguarding and protecting such Information from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

179.    To fulfill this duty of care, Midfirst was required to ensure it maintained adequate data security by, specifically, employing adequate security measures in its use of the MOVEit software.

180.    Midfirst was also required to oversee, monitor, and adequately protect all software, including MOVEit, utilized to store and transfer Plaintiffs' and the Class's PII.

181.    Midfirst's duty also included a responsibility to implement processes by which it could detect and analyze a vulnerability quickly and to give prompt notice to those affected in the case of a cyberattack.

182.    Midfirst knew or should have known of the risks inherent in collecting the PII of Plaintiffs and Class Members and the importance of adequate data security.

183.    Midfirst was on notice because, on information and belief, it knew or should have known of the substantial increase in cyberattacks in recent years, including recent similar attacks against Accellion and Fortra carried out by the same Russian cyber gang, Clop.

184.    After all, PII is highly valuable, and Defendant knew, or should have known,

the risk in obtaining, using, handling, transferring, and storing the PII of Plaintiffs and Class Members. Thus, Defendant knew, or should have known, the importance of guaranteeing the security of the MOVEit software.

185.    Midfirst owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that the MOVEit software had security capabilities in place to safeguard Plaintiffs' and Class Members' PII.

186.    Midfirst breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' PII. And but for Midfirst's negligence, Plaintiffs and Class Members would not have been injured. The specific breaches of duty and negligent acts and omissions committed by Midfirst include, but are not limited to:

  a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

  b.    Failing to employ adequate security measures in its use of the MOVEit software;

  c.    Failing to adequately monitor and oversee the security of the MOVEit software;

  d.    Failing to ensure that the MOVEit software had security in place to maintain reasonable data security;

  e.    Failing to intelligently decide what kinds of files to transfer using the MOVEit software and configure the software to operate in Midfirst's independent environment;

f.      Failing to have in place mitigation policies and procedures;

g.      Allowing unauthorized access to Class Members' PII;

h.      Failing to detect in a timely manner that Plaintiffs' and Class Members' PII had been compromised;

i.      Failing to adequately inform Plaintiffs and Class Members the full scope of the Data Breach by including the vague reference to "among other information" as part of the PII stolen in the Data Breach; and

j.      Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

187.    Defendant's duty to use reasonable care in protecting confidential data arose not only because of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII.

188.    Defendant owed Plaintiffs and members of the Class a duty to notify them within a reasonable time frame of any breach of their PII. Defendant also owed a duty to timely and accurately disclose to Plaintiffs and members of the Class the scope, nature, and occurrence of the Data Breach. This duty is necessary for Plaintiffs and Class Members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps in an effort to mitigate the fallout of Defendant's Data Breach.

189.    Defendant owed these duties to Plaintiffs and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom

Defendant knew or should have known would suffer injury-in-fact from its inadequate security protocols. After all, Defendant actively sought and obtained the PII of Plaintiffs and Class Members.

190.     It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' PII would result in injury to Class Members. Furthermore, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the financial industry. It was therefore foreseeable that the failure to implement adequate data security and privacy measures in Midfirst's use of the MOVEit software would result in one or more types of injuries to Class Members.

191.     Simply put, Defendant's negligence actually and proximately caused Plaintiffs and Class Members' actual and tangible injuries-in-fact. These injuries include, but are not limited to, the theft of their PII by criminals, improper disclosure of their PII, actual instances of identity theft and financial fraud, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence. Moreover, injuries-in-fact and damages are ongoing, imminent, and immediate.

192.     Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered because of the Data Breach.

193.     Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (1) strengthen its data security systems and monitoring procedures regarding the MOVEit software; (2) submit to future annual audits of those systems and monitoring procedures; and (3) to provide adequate credit monitoring to all Class Members.

## COUNT II
## NEGLIGENCE *PER SE*
### (On behalf of Plaintiffs and the Class)

194.    Plaintiffs restate and reallege the allegations stated above as if fully set forth herein.

195.    Pursuant to the Federal Trade Commission Act, 15 U.S.C. § 45, Defendant had a duty to implement adequate data security in its use of the MOVEit software and employ fair and adequate data security practices to safeguard Plaintiffs' and Class Members' PII.

196.    Defendant breached its duties to Plaintiffs and Class Members under the FTC Act by failing to implement adequate data security in its use of the MOVEit software and provide fair, reasonable, or adequate data security practices capable of safeguarding Plaintiffs' and Class Members' PII.

197.    Defendant's failure to comply with applicable laws and regulations constitutes negligence *per se.*

198.    The injuries to Plaintiffs and Class Members resulting from the Data Breach were directly and indirectly caused by Defendant's violation of the statutes described herein.

199.    Plaintiffs and Class Members were within the class of persons the Federal Trade Commission Act were intended to protect and the type of harm that resulted from the Data Breach was the type of harm these statutes were intended to guard against.

200.    But for Defendant's wrongful and negligent breach of its duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members would not have been injured.

201.    The injuries and harms suffered by Plaintiffs and Class Members were the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should

have known that they were failing to meet their duties and that Defendant's breach would cause Plaintiffs and Class Members to experience the foreseeable harm associated with the exposure of their PII.

202.    As a direct and proximate result of Defendant's negligent conduct, Plaintiffs and Class Members have suffered injuries, including instances of fraud and identity theft, and having their PII posted to the dark web. As such, Plaintiffs and Class Members are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

**COUNT III**
**BREACH OF IMPLIED CONTRACT**
**(On behalf of Plaintiffs and the Class)**

203.    Plaintiffs restate and reallege the allegations stated above as if fully set forth herein.

204.    Plaintiffs and the Class Members entered into implied contracts with Defendant under which Defendant agreed to safeguard and protect their PII by ensuring the MOVEit software had security in place capable of adequately protecting Plaintiffs' and Class Members' PII. Plaintiffs and Class Members also entered into implied contracts with Defendant under which Defendant agreed to timely and accurately notify Plaintiffs and Class Members that their information had been breached and stolen.

205.    Plaintiffs and the Class were required to, and delivered, their PII to Defendant as part of the process of obtaining financial and banking services.

206.    Plaintiffs and Class Members conferred a monetary benefit on Defendant in that Plaintiffs paid money to Defendant in exchange for services. Part of this monetary benefit

was to be used for configuring the MOVEit software to operate in a secure manner in Midfirst's independent environment.

207.    Defendant accepted possession of Plaintiffs' and Class Members' PII for the purpose of providing services.

208.    The implied promise of confidentiality includes consideration beyond those pre-existing general duties owed under state and federal regulations. The additional consideration included implied promises to take adequate steps to comply with specific industry data security standards and FTC guidelines on data security to ensure the MOVEit software had security in place to maintain reasonable data security.

209.    The implied promises include but are not limited to: (1) taking steps to ensure that any agents, including MOVEit, who are granted access to PII also protect the confidentiality of that data; (2) taking steps to ensure that the information that is placed in the control of its agents is restricted and limited to achieve an authorized purpose; (3) restricting access to qualified and trained agents; (4) designing and implementing appropriate retention policies to protect the information against criminal data breaches; (5) applying or requiring proper encryption; (6) multifactor authentication for access; and (7)  other steps to protect against foreseeable data breaches.

210.    Based on the implicit understanding, Plaintiffs and Class Members accepted Defendant's offers for services and provided Defendant with their PII.

211.    Plaintiffs and Class Members would not have permitted their PII to be collected and stored by Defendant had they known that Defendant would not safeguard their PII, as promised, or provide timely and accurate notice of the Data Breach.

212.     Plaintiffs and Class Members fully performed their obligations under their implied contracts with Defendant.

213.     Defendant breached the implied contracts by failing to safeguard Plaintiffs' and Class Members' PII and by failing to provide them with timely and accurate notice of the Data Breach.

214.     The losses and damages Plaintiffs and Class Members sustained, including the multiple instances of fraud, identity theft, and having their PII posted to the dark web (as described above) were the direct and proximate result of Midfirst's breach of its implied contracts with Plaintiffs and Class Members.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiffs and the Class)**

215.     Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

216.     This Count is pleaded in the alternative to Plaintiffs' breach of implied contract claim.

217.     Plaintiffs and Class Members conferred a benefit on Defendant by surrendering their PII.

218.     Midfirst derived profits from Plaintiffs' and the Class's PII because it allowed them to provide financial and banking services while receiving a revenue therefrom.

219.     As such, a portion of the payments made to Midfirst, which would not be possible without Plaintiffs and Class Members turning over their PII, was to be used to provide a reasonable and adequate level of data security that ensured the MOVEit software was secure

and capable of safeguarding Plaintiffs' and Class Members' PII. However, Midfirst did not do this. Rather, Midfirst retained the benefits of its unlawful conduct, including the amounts of payment received that should have been used for adequate cybersecurity practices.

220.    Defendant knew that Plaintiffs and Class Members conferred a benefit upon it, which Defendant accepted. Defendant profited from these transactions and used the PII of Plaintiffs and Class Members for business purposes, while failing to use the payments it received for adequate data security measures, which would have secured Plaintiffs' and Class Members' PII and prevented the Data Breach.

221.    If Plaintiffs and Class Members had known that Defendant would not adequately secure their PII, they would not have agreed to provide such PII.

222.    Due to Defendant's conduct alleged herein, it would be unjust and inequitable under the circumstances for Defendant to be permitted to retain the benefits of their wrongful conduct.

223.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and/or are at a substantial and continuous risk of suffering injury, including but not limited to: (i) actual identity theft and fraud; (ii) the loss of the opportunity to control how their PII is used; (iii) the compromise, publication, and theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their

PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued use of the MOVEit software; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

224.    Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from their wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiffs and Class Members may seek restitution or compensation.

225.    Plaintiffs and Class Members may not have an adequate remedy at law against Defendant, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

### COUNT V
### INVASION OF PRIVACY
### (On behalf of Plaintiffs and the Class)

226.    Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

227.    Plaintiffs and Class Members have a legally protected privacy interest in their PII, which is and was collected, stored, and maintained by Defendant, and they are entitled to the reasonable and adequate protection of their PII against foreseeable unauthorized access

and publication to criminal actors, as occurred with the Data Breach. The PII of Plaintiffs and Class Members contains intimate details of a highly personal nature.

228.   Plaintiffs and Class Members reasonably expected that Defendant would protect and secure their PII from unauthorized parties and that their PII would not be accessed, exfiltrated, and disclosed to any unauthorized parties or for any improper purpose.

229.   Defendant intentionally intruded into Plaintiff's and Class Members' seclusion by intentionally failing to implement adequate data security and oversight in its use of the MOVEit software.

230.   By failing to ensure the MOVEit software was capable of maintaining the confidentiality of Plaintiffs' and Class Members' PII, Defendant unlawfully invaded Plaintiff's and Class Members' privacy right to seclusion by, *inter alia*:

    a.   intruding into their private affairs in a manner that would be highly offensive to a reasonable person;

    b.   invading their privacy by improperly using their PII obtained for a specific purpose for another purpose, or disclosing it to unauthorized persons;

    c.   failing to adequately secure their PII from disclosure to unauthorized persons; and

    d.   enabling the disclosure of their PII without consent.

231.   This invasion of privacy resulted from Defendant's intentional failure to properly secure and maintain Plaintiff's and Class Members' PII, leading to the foreseeable unauthorized access, exfiltration, and disclosure of this unguarded data.

232.   Plaintiffs and Class Members' PII is the type of sensitive, personal information

that one normally expects will be protected from exposure by the very entity charged with safeguarding it. Further, the public has no legitimate concern in Plaintiffs' and Class Members' PII, and such information is otherwise protected from exposure to the public by various statutes, regulations, and other laws.

233.   The disclosure of Plaintiffs' and Class Members' PII to unauthorized parties is substantial and unreasonable enough to be legally cognizable and is highly offensive to a reasonable person.

234.   Defendant's willful and reckless conduct that permitted unauthorized access, exfiltration and disclosure of Plaintiffs' and Class Members' intimate and sensitive PII is such that it would cause serious mental injury, shame or humiliation to people of ordinary sensibilities.

235.   The unauthorized access, exfiltration, and disclosure of Plaintiffs' and Class Members' PII was without their consent, and in violation of various statutes, regulations and other laws.

236.   As a direct and proximate result of Defendant's intentional intrusion upon seclusion, Plaintiffs and Class Members suffered injury and sustained actual losses and damages, including multiple instances of fraud and identity theft, and the publication of Plaintiffs' PII to the dark web. Plaintiffs and Class Members alternatively seek an award of nominal damages.

## COUNT VI
### VIOLATION OF THE CALIFORNIA CONSUMER PRIVACY ACT OF 2018
### CAL. CIV. CODE §§ 1798.100, *et seq.* ("CCPA")
### (On behalf of Plaintiff Rubenstein and the California Subclass)

237.   Plaintiff Rubenstein and the California Subclass restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

238.   Plaintiff Rubenstein brings this claim individually and on behalf of the California Subclass against Defendant for violation of the California Consumer Privacy Act of 2018, Cal. Civ. Code §§ 1798.100, et seq. ("CCPA").

239.   Defendant engaged in unfair and deceptive acts and practices in violation of the CCPA, Cal. Civ. Code § 1798.150(a)(1), which provides:

> Any consumer whose nonencrypted or nonredacted personal information, as defined in [Section 1798.81.5(d)(1)(A)], is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action for [statutory or actual damages, injunctive or declaratory relief, and any other relief the court deems proper].

240.   Plaintiff Rubenstein and California Subclass Members are consumers and California residents as defined by Cal. Civ. Code §1798.140(i).

241.   Defendant is a "business" as defined by Cal. Civ. Code § 1798.140(d) because it collects and stores consumers' PII, including sensitive and personal information as defined by Cal. Civ. Code § 1798.81.5(d)(1)(A), and has annual gross revenues in excess of $25 million. Defendant collects personal information from, among other sources, consumers who use its financial and banking services. Defendant annually buys, receives for commercial purposes, sells, or shares for commercial purposes, alone or in combination, the personal information of 100,000 or more consumers, householders, or devices.

242.   Defendant had a duty to implement and employ adequate security measures in its use of the MOVEit software to protect Plaintiff Rubenstein's and California Subclass

Members' PII. As a direct and proximate result of Defendant's violation of its duty to employ adequate security measures in its use of the MOVEit software, Plaintiff Rubenstein's and California Subclass Members' PII was stolen in violation of the CCPA, Cal. Civ. Code § 1798.150.

243.    Defendant stored and maintained Plaintiff Rubenstein's and California Subclass Members' PII in a form that allowed criminals to access it.

244.    Defendant violated the CCPA, Cal. Civ. Code § l798.150(a), by failing to ensure that the MOVEit software had security in place to maintain reasonable data security and prevent Plaintiff Rubenstein's and California Subclass Members' PII from theft.

245.    As a direct and proximate result of Defendant's unfair and deceptive business practices, Plaintiff Rubenstein and Members of the California Subclass suffered ascertainable losses, including but not limited to, fraud and identity theft, a loss of privacy from having their PII published to the dark web, the loss of the benefit of their bargain, out-of-pocket monetary losses and expenses, the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach, the lost value of their PII, the imminent and substantially increased risk of fraud and identity theft, and the need to dedicate future expenses and time to protect themselves against further loss.

246.    Plaintiff Rubenstein and California Subclass Members seek relief pursuant to Cal. Civ. Code § 1798.150(a), including *inter alia*, actual damages, injunctive relief, and any other relief the Court deems proper. Plaintiff Rubenstein and the California Subclass also seek attorneys' fees and costs pursuant to Cal. Code Civ. Proc. § 1021.5.

247.    Because Defendant is still in possession of Plaintiff Rubenstein's and

California Subclass Members' PII, Plaintiff Rubenstein and the California Subclass seek injunctive or other equitable relief to ensure that Defendant implements and maintains reasonable data security measures and practices to prevent an event like the Data Breach from occurring again.

248.    Prior to filing their claims, Plaintiff Rubenstein and the California Subclass provided prior written notice of their claims to Defendant, pursuant to Cal. Civ. Code § 1798.150(b).

249.    Defendant has failed to cure the deficiencies that led to the Data Breach and the harm caused to Plaintiff Rubenstein and the California Subclass. Plaintiff Rubenstein and the California Subclass therefore seek all actual and compensatory damages according to proof or statutory damages allowable under the CCPA, whichever are higher, and such other and further relief as this Court may deem just and proper, including injunctive or declaratory relief.

<u>COUNT VII</u>
**VIOLATION OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT**
**CAL. CIV. CODE §§ 1750. *et seq.* ("CLRA")**
**(On behalf of Plaintiff Rubenstein and the California Subclass)**

250.    Plaintiff Rubenstein and the California Subclass restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

251.    Plaintiff Rubenstein brings this claim individually and on behalf of the California Subclass against Defendant for violation of the California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.* ("CLRA"), which is liberally construed to protect consumers against unfair and deceptive business practices in connection with the

conduct of businesses providing goods, property, or services to consumers for personal, family, or household use.

252.    Defendant is a "person" that provided "services" pursuant to the CLRA, Cal. Civ. Code §§ 1761(b)-(c), 1770.

253.    Plaintiff Rubenstein and California Subclass Members are "consumer[s]" who engaged in "transaction[s]" with Defendant, as defined under the CLRA, Cal. Civ. Code §§ 1761(d)-(e), 1770.

254.    Defendant engaged in unfair and deceptive acts and practices in violation of the CLRA, Cal. Civ. Code § 1770, which prohibits companies, like Defendant, from:

> (a)(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities which they do not have.
>
> (a)(7) Representing that goods or services are of a particular standard, quality, or grade . . . if they are of another.
>
> (a)(14) Representing that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or that are prohibited by law.

255.    Defendant's acts and practices were intended to and did result in the sale of services to Plaintiff Rubenstein and California Subclass Members in violation of the CLRA, Cal. Civ. Code § 1770(a)(5), (7) and (14), by, among other things, omitting and concealing the material fact that Defendant did not implement and maintain adequate data security measures in its use of the MOVEit software to secure consumers' PII.

256.    Defendant's deceptive, unfair, and unlawful acts or practices in violation of the CLRA include:

> a.  Implementing inadequate data security and privacy measures in its use

of the MOVEit software to protect Plaintiff Rubenstein's and
California Subclass Members' PII, which was a direct and proximate
cause of the Data Breach;

b. Failing to identify and remediate foreseeable security and privacy risks
   and sufficiently improve security and privacy measures, despite
   knowing the risk of cybersecurity incidents, which was a direct and
   proximate cause of the Data Breach;

c. Failing to ensure that the MOVEit software had security in place to
   maintain reasonable data security;

d. Failing to oversee and monitor the MOVEit software;

e. Failing to comply with common law and statutory duties pertaining to
   the security and privacy of Plaintiff Rubenstein's and California
   Subclass Members' PII, including duties imposed by the Federal Trade
   Commission Act, 15 U.S.C. § 45, which was a direct and proximate
   cause of the Data Breach;

f. Misrepresenting that they would protect the privacy and confidentiality
   of Plaintiff Rubenstein's and California Subclass Members' PII,
   including by implementing and maintaining reasonable data security
   measures;

g. Misrepresenting that they would comply with common law and
   statutory duties pertaining to the security and privacy of Plaintiffs' and
   Class Members' PII, including duties imposed by the Federal Trade

Commission Act, 15 U.S.C. § 45;

h. Omitting, suppressing, and concealing the material fact that they did not reasonably or adequately employ security measures in its use of the MOVEit software; and

i. Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Rubenstein's and California Subclass Members' PII, including duties imposed by the Federal Trade Commission Act, 15 U.S.C. § 45.

257. Defendant's omissions and misrepresentations were material because they were likely to and did deceive reasonable consumers, including Plaintiff Rubenstein and California Subclass Members, about the adequacy of Defendant's data security practices and their ability to protect the confidentiality of the PII they solicited, collected, stored, and maintained.

258. Past breaches in the financial services industry put Defendant on notice that their data security practices were inadequate to safeguard Plaintiff Rubenstein's and California Subclass Members' PII, and Defendant knew or should have known that the risk of a data breach was highly likely.

259. Because Defendant required Plaintiff Rubenstein and California Subclass Members to provide their PII as a prerequisite to receive Defendant's services, Plaintiff Rubenstein and California Subclass Members reasonably expected that Defendant's data security, data storage systems, and use of the MOVEit software were adequate to secure and

protect their PII.

260.    Plaintiff Rubenstein and California Subclass Members relied to their detriment on Defendant's misrepresentations and deceptive omissions regarding their data security practices.

261.    Had Defendant disclosed to Plaintiff Rubenstein and California Subclass Members of its failure to secure the MOVEit software, therefore causing the theft of their PII, Plaintiffs and Class Members would not have entrusted Defendant with their PII.

262.    As a direct and proximate result of Defendant's unfair and deceptive business practices, Plaintiff Rubenstein and California Subclass Members suffered ascertainable losses, including but not limited to, a loss of privacy, the loss of the benefit of their bargain, out-of-pocket monetary losses and expenses, the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach, the lost value of their PII, the imminent and substantially increased risk of fraud and identity theft, and the need to dedicate future expenses and time to protect themselves against further loss.

263.    Prior to filing their claims, Plaintiff Rubenstein and the California Subclass provided prior written notice of their claims for damages to Defendant, in compliance with Cal. Civ. Code § 1782(a). Defendant has failed to cure the deficiencies that led to the Data Breach and the harm caused to Plaintiff Rubenstein and the California Subclass.

264.    Plaintiff Rubenstein and the California Subclass seek all monetary and non-monetary relief allowed by law, including damages, an order enjoining the acts and practices described above, attorneys' fees, and costs under the CLRA.

**COUNT VIII**

### DECLARATORY AND INJUNCTIVE RELIEF
### (On behalf of Plaintiffs and the Class)

265.    Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

266.    Plaintiffs pursue this claim under the Federal Declaratory Judgment Act, 28 U.S.C. §2201.

267.    As previously alleged, Defendant owes duties of care to Plaintiffs and the Class Members that require it to adequately secure and delete their PII.

268.    Defendant still possesses the PII of Plaintiffs and Class Members.

269.    Defendant has not satisfied its obligations and legal duties to Plaintiffs and the Class Members.

270.    Plaintiffs, therefore, seek a declaration that (1) Defendant's existing security measures in its use of the MOVEit software and data retention/deletion policies do not comply with its contractual obligations and duties of care, and (2) to comply with its obligations and duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to:

      a.  Ordering Defendant to stop its use of the MOVEit software;

      b.  Ordering Defendant to implement adequate data security and privacy measures in its use and selection of future service providers who receive customers' PII;

      c.  Ordering Defendant to significantly increase its spending on cybersecurity, including software, systems and personnel;

d.  Ordering Defendant to engage third-party security auditors and internal personnel to run automated security monitoring on future service providers used by Defendant;

e.  Ordering that Defendant audit, test, and train its security personnel regarding any new or modified procedures;

f.  Ordering that Defendant require future service providers to purge, delete, and destroy in a reasonably secure manner any PII not necessary for its provision of services;

g.  Ordering that Defendant require future service providers to conduct regular software scanning and security checks;

h.  Ordering Defendant to guarantee future service providers are routinely and continually conducting internal training and education to inform their internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

i.  Ordering Defendant to require future service providers to implement and enforce adequate retention policies for PII, including destroying PII as soon as it is no longer necessary for it to be retained;

j.  Ordering Defendant to meaningfully educate its employees about the threats they face as a result of the loss of their financial and personal information to third parties, as well as the steps they must take to protect themselves; and

k.  Ordering that Defendant require future service providers to remove

former customers' PII from any hard drive or server that has external (Internet) access.

## VII.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Classes described above, seek the following relief:

a.   An order certifying this action as a Class action, defining the Classes as requested herein, and finding that Plaintiffs are proper representatives of the Nationwide Class and California Subclass requested herein;

b.   Judgment in favor of Plaintiffs and Class Members awarding them appropriate monetary relief, including actual damages, statutory damages, equitable relief, restitution, disgorgement, and statutory costs;

c.   An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

d.   An order instructing Defendant to purchase or provide funds for lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members;

e.   An order requiring Defendant to pay the costs involved in notifying Class Members about the judgment and administering the claims process;

f.  A judgment in favor of Plaintiffs and Class Members awarding them prejudgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

g.  An award of such other and further relief as this Court may deem just and proper.

## VIII.  <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a trial by jury trial on all triable issues.

Dated: January 2, 2024

*/s/: William B. Federman*_____
William B. Federman
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Ave.
Oklahoma City, OK 73120
Telephone: (405) 235-1560
Email: wbf@federmanlaw.com

Daniel Srourian, Esq. (*pro hac vice* forthcoming)
**SROURIAN LAW FIRM, P.C.**
3435 Wilshire Blvd., Suite 1710
Los Angeles, CA 90010
Telephone: (213) 474-3800
Email: daniel@slfla.com

M. Anderson Berry (admitted *pro hac vice*)
**THE ARNOLD LAW FIRM**
865 Howe Ave.
Sacramento, California 95825
Telephone: (916) 777-7777
Email: aberry@justice4you.com

Jason M. Wucetich (admitted *pro hac vice*)
**WUCETICH & KOROVILAS LLP**
222 Pacific Coast Highway, Suite 2000
El Segundo, California 90245

66

Telephone: (310) 355-2001
Email: jason@wukolaw.com